**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0426-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

NATHANIEL YOUNG, JR.,
a/k/a NATHANIEL YOUNG,
and NATE E. YOUNG,

    Defendant-Appellant.

_____

Submitted May 28, 2026 – Decided June 30, 2026

Before Judges Mayer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-12-0812.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Jeffrey L. Weinstein, Designated Counsel, on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Nathaniel Young appeals denial of his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm substantially for the reasons stated in Judge Lisa Miralles Walsh's cogent written decision.

I.

On August 25, 2015, at around 10:45 p.m., Jason Barat of the Station Cab Company received a call from a male who requested to be picked up from an address on Bedford Street in Rahway and dropped off at an address on Washington Street. At first, Barat thought this was "odd" because the address given for Washington Street does not exist. He assumed the caller was mistaken and dispatched a taxicab driven by Imad Alasmar.

Meanwhile on Bedford Street, a female neighbor and her boyfriend were sitting in a vehicle parked outside her home. The female neighbor observed an "African American male with shoulder length dreadlocks wearing a white shirt and like cargo shorts" walking in the direction of Harold Street. She did not recognize him from the neighborhood.

Shortly after, the female neighbor saw a taxicab driving on Harold Street turn onto Bedford Street and observed it was not driving straight, but "was just wobbling a little bit." She then heard two "very high pitched . . . pops" and thought the cab was "backfiring." The taxicab immediately accelerated at full

A-0426-24

speed directly toward the boyfriend's parked car, "almost exactly straight head on," and crashed into the vehicle.

The female neighbor was ejected from her boyfriend's car and briefly lost consciousness. She suffered "a broken left shoulder blade, six broken ribs, a broken pelvis, a fractured tailbone and spine, lacerations to the liver and spleen, and a torn ACL." "She also suffered injuries to her foot and ankle that severed part of her heel," causing her to lose thirty to forty per cent of the skin around that area. She underwent fifteen surgeries and eventually required amputation of her right leg below the knee.

Another female neighbor, who also lived on Bedford Street, was watching television when she heard a loud noise that sounded like a car backfiring. After hearing a second bang and a crash, she ran outside onto her front lawn to see a taxicab had hit a parked car and an individual, later identified as defendant, running towards her home. This female neighbor promptly called 9-1-1. After calling, she again noticed defendant, who this time was running down the middle of the street. "Although she did not get a clear look at his face she described the individual as a thin black male, approximately six-feet tall, with shoulder length dreadlocks, wearing a white tee shirt and dark pants."

3 A-0426-24

Corporal Frank Weitry of the Rahway Police Department arrived at the scene minutes later and observed a car up against a tree and heard a woman screaming. He found the first female neighbor trapped between the tree and the curb. He checked inside the taxicab and saw the driver deceased, "slumped over into the back seat," noting it was "obvious" he had suffered a traumatic head injury. The driver was later identified as Alasmar, whose autopsy later showed the cause of death was two gunshot wounds to the face and neck.

Union County Sheriff's Officers processed the scene and recovered a .45 caliber Ruger P90 handgun inside of the passenger side airbag of the taxicab, a discharged cartridge casing under the front passenger seat, and blood-stained money on the floor of the driver's side. Union County Sheriff Detective Edward Suter also assessed the taxicab and recovered a second discharged cartridge casing along with a projectile located inside the driver's side door panel.

In the ensuing investigation, detectives from the Union County Prosecutor's Office interviewed defendant's former girlfriend and mother of his child. She provided police with defendant's phone number. She told them as of August 25, 2015, defendant still had dreadlocks, but the next day he cut them off and exhibited injuries to his face and hands. Forensic evidence recovered from the scene linked defendant to the crimes.

4

A Union County grand jury returned an indictment, charging defendant with: murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); first-degree robbery, N.J.S.A. 2C:15-1 (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and second-degree aggravated assault, N.J.S.A. 2C:12-5(b)(1) (count five).

Following trial, a jury found defendant guilty on all counts. The judge sentenced defendant to a fifty-year term of imprisonment with an eighty-five percent period of parole ineligibility on count one, and a consecutive eight-year term of imprisonment on count five. Defendant directly appealed, and we affirmed the conviction and sentence. See State v. Young, No. A-2661-18 (App. Div. Dec. 7, 2022). The Supreme Court denied defendant's petition for certification. State v. Young, 253 N.J. 582 (2023).

On August 30, 2023, defendant filed a self-represented PCR, alleging ineffective assistance of trial counsel. Defendant was later assigned PCR counsel, who filed an amended petition and supplemental letter brief. On June 25, 2024, the parties argued the motion and Judge Miralles Walsh, who had also presided over defendant's trial, denied defendant's PCR without an evidentiary hearing.

The judge found Rule 3:22-5 barred defendant's claim that his trial counsel was ineffective during the motion for a Franks[1] hearing because the issue was already raised and decided on direct appeal. The judge found defendant's other claims were not procedurally barred but lacked merit as defendant failed to establish a prima facie case of ineffective assistance of counsel.

Specifically, the judge rejected defendant's argument that trial counsel was ineffective in choosing not to present a music video posted on YouTube, filmed weeks before the shooting, showing defendant holding a gun as a possible explanation for why his DNA and fingerprints were found on the murder weapon. Aside from defendant's "brief certification," the judge noted the lack of evidence that defendant actually informed trial counsel of this music video. Even assuming counsel knew of the video, the judge found the strategic decision not to present the video could not be construed in hindsight as deficient performance.

The judge rejected defendant's argument that counsel was ineffective in failing to investigate and request discovery for an unrelated shooting as evidence of third-party guilt. She found defendant's assertions did not satisfy his burden,

---

[1] Franks v. Delaware, 438 U.S. 154 (1978). This ruling is not an issue on appeal.

A-0426-24

considering there was no evidence showing what an investigation would have revealed and that defense counsel strategically chose not to pursue a third-party guilt defense.

Judge Miralles Walsh further found defendant's assertion that trial counsel pressured him not to testify was unsupported by the record. Quoting extensively from the trial record, the judge found defendant and his attorney discussed whether he should testify at length and, ultimately, defendant knowingly and voluntarily waived his right to testify at his trial.

In sum, the judge found none of defendant's arguments availing. Defendant appeals, raising the following arguments:

POINT I

TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF THIRD-PARTY GUILT.

POINT II

TRIAL COUNSEL WAS INEFFECTIVE IN ABRIDGING [DEFENDANT]'S RIGHT TO TESTIFY AND TO ASSERT HIS INNOCENCE.

POINT III

TRIAL COUNSEL WAS INEFFECTIVE BY DISCLOSING THAT [DEFENDANT] HAD A SBI NUMBER, THEREBY CONVEYING THAT [DEFENDANT] HAD A CRIMINAL HISTORY.

A-0426-24

In addressing ineffective assistance of counsel claims, we follow the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987).

A defendant must first demonstrate that counsel's performance was deficient. Strickland, 466 U.S. at 687. Performance is deficient when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Ibid. "Judicial scrutiny of counsel's performance must be highly deferential," and a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.

Next, to show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." Id. at 694. A defendant must present more than bald assertions or conclusory statements. State v. Porter, 216 N.J. 343, 355 (2013). Rather, there must be a proffer or demonstration that, absent counsel's deficient performance, the outcome probably would have been different. Strickland, 466 U.S. at 694. Because the PCR court did not conduct an evidentiary hearing, we review its determination de novo. State v. Harris, 181 N.J. 391, 421 (2004).

On full examination of the record, we add only the following to Judge Miralles Walsh's thorough decision. Regarding defendant's first point, defense counsel chose not to pursue any affirmative defenses but rather attempted to challenge the State's case-in-chief by calling several witnesses at trial. Defense counsel's decision not to investigate or pursue evidence of third-party guilt was a sound strategic one; although unsuccessful, it did not constitute deficient performance.

The assertions in defendant's second point are belied by the record, as the PCR judge observed. Defendant knowingly and voluntarily chose not to testify following a lengthy dialogue with the judge, during which the judge thoroughly informed him of the nature of his right not to testify and the consequences he might face should he choose to waive that right. She inquired of him twice over

9

the course of two weeks whether he wanted to testify, and defendant made his informed decision.

Defendant now contends, for the first time, that trial counsel rendered ineffective assistance by eliciting purportedly prejudicial testimony regarding the fact that defendant had a State Bureau of Identification (SBI) number during counsel's examination of defense witness Linda Schnoor, an employee of the New Jersey State Police Department's Biometric Identification Unit.

> [DEFENSE COUNSEL:] Now, ma'am, is there information on that document that had been pertaining to . . . a suspect?
>
> [SCHNOOR:] Yes.
>
> [DEFENSE COUNSEL:] And what is that information?
>
> [SCHNOOR:] An SBI number.
>
> [DEFENSE COUNSEL:] Can you tell us what [is an] SBI number?
>
> [SCHNOOR:] State [B]ureau of [I]dentification number.

On hearing this testimony, the judge called counsel to sidebar and asked defense counsel why he was inquiring about an SBI number. The judge expressed concern such information was prejudicial and that counsel was in "dangerous territory." Defense counsel explained that the SBI number was the

10

sole means to link Schnoor's fingerprint examination to defendant. Because Schnoor's examination of fingerprint evidence recovered from the interior of the taxicab was ultimately inconclusive—even though directly compared to defendant's fingerprints—eliciting such testimony was beneficial to the defense. As phrased by counsel:

> SBI number that's crossed off and says inconclusive which to me is a very important piece of evidence that showed [defendant] -- in [the witness's] opinion . . . is at the very least inconclusive as to his fingerprints being located in the area of a vehicle or items pertaining to the vehicle in this offense. That's why it's very relevant.

Defense counsel sought to capitalize on this theory during closing arguments, emphasizing that the prosecutor tried to undermine Schnoor—even though, on the surface, she should have been a State's witness. However, because Schnoor could not positively identify the defendant as the perpetrator, the prosecutor attempted to undermine her finding of "inconclusive":

> [Schnoor] works for New Jersey State Police. She doesn't work for the defense team. . . . [S]he's a law enforcement officer. State Police, [B]ureau of [I]dentification. . . . Do you remember how much effort did [the prosecutor] go to discredit Miss Schnoor? Remember her question. When I showed you this picture, you thought it was a palm print, as if somehow this woman has no idea what she's talking about. That's what [the prosecutor]'s saying. It would all be fine and well if Miss Schnoor was somehow employed by me

11

and works for my office and that would be great, and probably a valid point. The irony is that this woman, Detective Lopez gave her the prints to examine them. Think about the greatest irony of it all. Janet Lopez. Janet Lopez brought her the prints to look at them and put them in the system. That's important. So she was good on September 2, 2015, because we dropped her th[is] stuff to look at them. And she looked at among others, picture [forty-eight]. Photograph [forty-eight] which is this photograph. That's what she looked at. And what does she say? I deemed them to be non-suitable. Simply she said ["]I had to find at least [ten] points to be able to put them in the system,["] and she said ["]I could not get [ten] points. I couldn't.["] Because you can't.

Defendant's contention that an SBI number is suggestive of criminality was also discounted by Schnoor herself, who noted at sidebar that an SBI is assigned to people, for example, who apply for gun permits.

THE COURT: . . . So on the request for examination [of a fingerprint,] it has an SBI number. Correct?

[SCHNOOR]: For the potential suspect, yes.

THE COURT: Did that mean anything to you in the work that you do if there's an SBI number there?

[SCHNOOR]: Doesn't mean anything.

The court sought elaboration:

THE COURT: One other thing I wanted to discuss with you. As far as an SBI number, when you have an SBI number, what does that mean to you?

12

[SCHNOOR]: I know it's a [S]tate [B]ureau of [I]dentification number meaning they're in the system, but it doesn't tell you what or why until -- I have to go into the computer and put the SBI to bring the card out. That's all it means.

THE COURT: Okay. That's all SBI number means to you?

[SCHNOOR]: State [B]ureau of [I]dentification number.

THE COURT: It doesn't mean anything else to you?

[SCHNOOR]: No, because it could be an applicant for . . . a firearm[]. They have an SBI number.

We reject defendant's arguments. The fleeting reference was, at most, ambiguous and was made in service of counsel's broader strategy to highlight the alleged lack of forensic evidence linking defendant to the crime. This strategic choice does not rise to the level of deficient performance. Even assuming, for the sake of argument, that it was error, it was not so prejudicial as to affect the outcome of the proceedings. Considering all the evidence presented at trial, including both witness testimony and physical evidence, there is no reasonable probability that the jury's verdict would have been different. Strickland, 466 U.S. at 694.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Haxley

Clerk of the Appellate Division

13